<u>**EXHIBIT A**</u>

| | |
|---|---|
| State of Illinois | ) |
| | ) ss |
| County of St. Clair | ) |

<u>**UNSWORN DECLARATION UNDER PENALTY OF PERJURY**</u><br><u>**IN SUPPORT OF COMPLAINT FOR FORFEITURE**</u>

I, Larry Brantley, declare under penalty of perjury the following:

At all relevant times, I have been a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). The contents of this Declaration are based on information provided to me during the course of my investigation from participants in the criminal activity, from other witnesses, and from other law enforcement officers.

1. On November 11, 2020, declarant and TFO Angelque Sarmento (TFO Sarmento) conducted a traffic stop on a white 2019 Ford Transit van bearing a Texas registration for following too closely and improper lane usage on Interstate 70 west bound at mile marker 17 in Madison County, Illinois.

2. The registration of the vehicle returned to Brianna M. Houser out of Grandview, Texas. Declarant exited his patrol vehicle and approached the passenger side of the van to make contact with the driver, who identified himself as Samvel ASILYAN. Declarant informed ASILYAN the reason for the traffic stop and requested he produce his driver's license. ASILYAN produced a California driver's license and told declarant that he (ASILYAN) was a professional driver with a perfect record, he was a family boy (man), and to check his record. ASILYAN continued talking about himself in what declarant believed to be a nervous trait. While ASILYAN spoke, declarant handed ASILYAN's driver's license to TFO Sarmento who returned to the patrol vehicle. Declarant asked ASILYAN if he did logistics and ASILYAN said he did. Declarant asked where ASILYAN was coming from

and when he last dropped a load. ASILYAN stated that he dropped a load in Cleveland, Ohio yesterday (November 10, 2020) and was driving empty to St. Louis, Missouri to pickup a new load. ASILYAN stated that he did not have a load yet and was hoping his dispatcher would call him after lunch to find him a load in St. Louis. Declarant asked ASILYAN if the van belonged to him or if it was a company vehicle and ASILYAN said the van belonged to him, but he leases it. Declarant asked ASILYAN if he had the registration for the vehicle and ASILYAN had trouble locating it. Declarant remained at the passenger side window and spoke with ASILYAN while he searched for the registration.

3. During the above exchange, TFO Sarmento returned to the patrol vehicle with ASILYAN's information and began a query of ASILYAN's information in law enforcement data bases. ASILYAN returned as having no criminal history. TFO Sarmento also began checking law enforcement databases on the vehicle owner, Brianna M. Houser, and other connections to her. Houser returned to have a criminal record for Theft of Property in 2013 out of Fort Worth, Texas. TFO Sarmento located the father of Houser's child as Adam A. Aguirre. TFO Sarmento also located social media posts by Houser who labeled Aguirre and herself as being together in a relationship. TFO Sarmento located multiple photographs of Houser and Aguirre posing with expensive vehicles and property. TFO Sarmento checked Aguirre's information in law enforcement databases and located him within the DEA database as a Retail Level Dealer for Counterfeit Controlled Pharmaceutical Trademarked Benzodiazepines.

4. While ASILYAN searched for the registration, declarant observed him searching through the same stack of papers several times, each time unable to locate the registration. Declarant told ASILYAN, "You're fine" in hopes to calm ASILYAN's nerves.

Declarant believed ASILYAN's nervous behavior was unnecessary due to him being informed that he was only receiving a warning and that his "perfect record" would not be affected. Due to ASILYAN's nervous behavior, he was unable to locate the registration for the vehicle. Declarant advised ASILYAN he would attempt to locate it himself at his vehicle.

5. Declarant returned to his patrol vehicle to check on the queries made by TFO Sarmento. TFO Sarmento relayed the information she gathered on ASILYAN, Houser, and Aguirre. Declarant informed TFO Sarmento of his conversation with ASILYAN and the information he gathered. The TFOs checked the distance between ASILYAN and Houser and analyzed the plausibility of ASILYAN leasing a van from Houser who lives approximately twenty driving hours away from him. The TFOs believed the nervous behavior shown by ASILYAN, the implausible driving claim, and the potential connection to Houser and Aguirre were indicators of possible criminal behavior. The TFOs believed they had enough reasonable suspicion to detain the vehicle for a K-9 to sniff.

6. Declarant returned to ASILYAN's vehicle to return his driver's license. ASILYAN had located his registration paperwork and showed declarant. Declarant looked at the registration and asked ASILYAN how he knew Houser when she lives in Grandview (Texas). ASILYAN immediately answered by saying, "That's my cousin!" Declarant informed ASILYAN again that he was only receiving a (verbal) warning for the traffic violation and handed ASILYAN his driver's license to conclude the traffic stop. Declarant then asked ASILYAN if there was anything illegal inside the vehicle and gave examples, including marihuana, cocaine, methamphetamines, heroin, large sums of United States currency, guns, and/or dead bodies. ASILYAN replied no to everything. Declarant asked

ASILYAN if it was ok if the TFOs searched his vehicle and ASILYAN said, yes. Declarant then asked ASILYAN to step out of the vehicle while a search was conducted.

7. The TFOs began searching the vehicle. While searching the rear cargo area, declarant searched underneath a portable camping bed and located three black plastic trash bags. Declarant opened one of the plastic bags and located a large clear vacuum-sealed bag containing a large amount of United States currency. Declarant checked the other two black plastic trash bags and located two additional vacuum-sealed bags of United States currency inside. Declarant informed TFO Sarmento of his findings and she placed handcuffs on ASILYAN for suspicion of Money Laundering.

8. Declarant left the vacuum sealed bags of United States currency in their original locations and exited the van. The TFOs contacted TFO Jake Degener (TFO Degener) and TFO Kyle Waddington (TFO Waddington) to respond to the traffic stop for assistance. TFOs Degener and Waddington arrived a short time later.

9. Declarant read ASILYAN his Miranda Rights. ASILYAN indicated that he understood his rights. Declarant told ASILYAN a large amount of money was located inside the vehicle and asked if it belonged to him. ASILYAN said, "No. It's a private delivery." Declarant asked ASILYAN if he knew how much money was inside the vehicle and he said, "I don't know." ASILYAN stated that he had money inside the vehicle that belonged to him and said it was in a "milk color bag" next to his seat. ASILYAN said the money next to his seat was proceeds from selling a semi-truck he owned and he wanted to buy a van like the one he was driving.

10. Declarant returned to ASILYAN's vehicle and located the United States currency ASILYAN described between the front driver and passenger seats. The United

States currency was inside a white (milk colored) plasticbag and rolled up several times in white paper towels appearingto look like a roll of paper towels. Declarant left the United States currency in its original location and reproached ASILYAN and confirmed that there was not any additional currency inside the vehicle. ASILYAN confirmed that there was no additional currency inside the van.

11. Before the TFOs relocated to the Fairview Heights Resident Office (FHRO), the TFOs began processing the vehicle for evidence. TFO Degener took photographs of the vehicle and its contents for evidence. TFO Degener then removed the undetermined amount of United States currency from its location underneath the portable camping bed and placed it into Self-Sealing Evidence Envelope (SSEE) # EL00103048, as witnessed by TFO Waddington. Before TFO Degener sealed the evidence envelope, TFO Waddington asked ASILYAN if the United States currency belonged to him and ASILYAN responded by saying, "No. My money is next to the seat. This is for sure, not my money." ASILYAN adamantly denied any ownership to the United States currency in Self-Sealing Evidence Envelope (SSEE) # EL00103048. TFO Degener then removed the undetermined amount of United States currency from its location between the front driver and passenger seats and placed it into Self-Sealing Evidence Envelope (SSEE) #M000051275, as witnessed by TFO Waddington. TFO Waddington asked ASILYAN if this United States currency belonged to him and ASILYAN said that was his money and it was around twenty-five thousand. ASILYAN signed SSEE #M000051275, claiming ownership. TFO Degener then sealed both evidence envelopes in the presence of ASILYAN, witnessed by TFO Waddington. TFO DEGENER secured the evidence envelopes containing the United States currency into the rear passenger seat of his patrol vehicle and secured ASILYAN in the front passenger side

seat for transport to the FHRO.

12. TFO Waddington transported ASILYAN's vehicle to the FHRO for processing. All TFOs left the scene of the traffic stop and relocated to the FHRO to assist with the processing the case. While en route to the FHRO, ASILYAN did not say anything pertinent to TFO Degener regarding the case. Upon arrival at the FHRO, TFOs escorted ASILYAN into a secure booking area and secured him into a temporary holding cell. While processing the case at the FHRO, TFO Sarmento escorted ASILYAN into the booking area where she took ASILYAN's fingerprints and completed a DNA kit. TFOs Degener and Waddington completed a DEA-12 for an undetermined amount of United States currency and issued it to ASILYAN before his processing was completed.

13. Two separate K-9 sniffs of the seizure currency were performed by TFO Degener and K-9 Blu. TFO Degener informed TFO Sarmento that K-9 Blu gave a positive alert for narcotics in both K-9 sniffs.

14. A thorough search of the vehicle was conducted by TFOs at the FHRO. Declarant removed one black iPhone cellular phone and two gray/black Alcatel cellular phones from the van. TFOs also made copies of miscellaneous paperwork from the vehicle for review.

15. Declarant and TFO Sarmento conducted a video and audio recorded interview with ASILYAN. ASILYAN was read his Miranda rights prior to beginning the interview. ASILYAN advised that he understood his Miranda rights. ASILYAN did not wish to answer any questions regarding the case and invoked his right to be silent. While gathering booking information for ASILYAN, he stated that the IPhone located by TFOs in his vehicle was his personal phone. ASILYAN stated that the two Acatel flip phones were temporary

phones he uses for a month at a time. ASILYAN without prompting stated that he is a good man and that for once in his life he just wanted to make a little bit of money. Declarant advised ASILYAN that since ASILYAN advised he did not wish to answer any questions, TFOs could not question him. ASILYAN advised that he understood, but then continued to ask questions. ASILYAN advised that he has the paperwork back in California for the United States currency located in the milk colored paperbag inside of his vehicle.

16. ASILYAN gave verbal consent to have his cellular phones searched and to have the data downloaded from them. Declarant explained that the cellular phone information could not be extracted until the following day, and informed ASILYAN that the phones could be retrieved by him in person or the TFOs could return them to his home address by mail. ASILYAN stated that he approved of either scenario presented. After the interview with ASILYAN, declarant secured the phones into a temporary storage locker until the data could be removed.

17. On November 12, 2020, the data was extracted from all three cellular phones belonging to ASILYAN. On the same date, TFO Kevin Thebeau returned all three cellular phones to ASILYAN via FEDEX to ASILYAN's home address.

18. An official count was conducted on the vacuum-sealed currency located in the black trash bags and it was determined that the seized currency totaled $280,025.00.

19. An official count was also conducted on the currency located in the white plastic bag between the driver and passenger seats and it was determined that the seized currency totaled $23,450.00.

19. Based on the foregoing, declarant believes that both the $280,025.00 in United

States Currency and $23,450.00 in United States Currency is property which constitutes money furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or money used to facilitate a violation of 21 U.S.C. § 801 *et seq.*

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11th day of May, 2021.

TFO _____
LARRY BRANTLEY
Task Force Officer
Drug Enforcement Administration